CLERK'S OFFICE U.S. DIST. COURT
AT HARRISONBURG, VA
FILED

May 31, 2024
LAURA A. AUSTIN, CLERK
BY: s/J.Vasquez
DEPUTY CLERK

## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
(Harrisonburg Division)

**RANDOLPH-MACON ACADEMY,**
200 Academy Drive
Front Royal, VA 22630

        Plaintiff,

   v.

**LOUIS MASSETT**,
117 Lee Street
Front Royal, VA 22630

        Defendant.

Civil Action No. <u>5:24-cv-37</u>

## <u>VERIFIED COMPLAINT</u>

1.  Plaintiff Randolph-Macon Academy ("RMA") brings this action to remedy the ongoing, improper, and unlawful misappropriation of RMA's confidential and trade secret information by a former RMA employee, Louis Massett ("Massett"), as well as Massett's ongoing and material breach of his contractual obligations to RMA.

2.  RMA, located in Front Royal, Virginia, is a private, non-profit boarding and day school for students in grades 6 to 12 and post-graduate students.  RMA was founded in 1892 and, in the 13 decades since its founding, has worked to further its mission of shaping good character through positive leadership, professional conduct, and service.

3.  Defendant Massett served as the Director of Advancement for RMA from September 1, 2021, until his termination on October 14, 2022.  One of the functions of RMA's Advancement Office is communicating with members of the RMA community and other potentially interested individuals and organizations to solicit donations to the school. As a non-profit institution, such charitable giving is a key component of RMA's ability to provide a quality educational experience to its students.

4.     While employed by RMA, Massett received and had access to RMA's confidential and trade secret information related to the school's efforts to obtain funding to support its mission, including, among other things, current and historical information about RMA's donors.  In particular, RMA provided Massett access to the contact lists that RMA used to communicate with actual and potential donors, including personal contact information for alumni of RMA, current and former RMA employees, parents of current and former RMA students, and other individuals and institutions that RMA had identified as actual or potential supporters of RMA.  RMA has devoted significant resources to collecting and curating this information over the course of decades.

5.     Massett repeatedly acknowledged the proprietary, confidential, and trade secret nature of RMA's information—including the contact lists RMA maintained regarding its actual and potential donors—in contracts that he executed both before and during his employment by RMA.  In total, Massett executed three such contracts.  In each, Massett agreed that he would protect the confidentiality of RMA's information and would not disclose or make use of such information, whether directly or through a third party.  Both before and during his employment, Massett expressly acknowledged that his contractual duty to protect the confidentiality of RMA's information and not to disclose or make use of such information, whether directly or through a third party, survived the end of his employment with RMA.

6.     On Friday, October 14, 2022, Massett was terminated by RMA for unsatisfactory performance and misconduct.  RMA disabled Massett's access to information available through RMA's network, including Massett's access to the databases housing the contact information of actual and potential donors maintained by RMA, that same day.

7.     The following Tuesday, October 18, 2022, Massett complained to RMA about being "locked out" of RMA's systems due to his termination but asserted he could still "contact RMA's constituents and share [his] grievances" if he chose because he had downloaded "everyone's contact info" to his "home computer."  Massett represented he would not do so, however, as it would be a "vindictive act" that "would only serve to undermine [his] efforts to remediate the injustices" he claimed to have suffered.

8.     Upon learning from Massett that he had downloaded RMA's confidential and trade secret information to a personal computer, RMA promptly instructed Massett "to delete that information in its entirety" from his "personal computer and any other personal devices you have or own," and further instructed Massett "to abide by the Non-Disclosure Agreement you signed when you interviewed for your position and the Confidentiality provision found in your employment agreement."  Massett confirmed receipt of this communication directing him to delete RMA's information and reminding him of his ongoing obligation not to disclose or use RMA's information.

9.     Based upon recent mass emails and individualized communications sent to the personal email addresses of individuals whose information was included in the "contact info" that Massett admittedly took from RMA, RMA has reason to believe that Massett did not delete RMA's confidential and trade secret information as directed by RMA following Massett's termination, but instead retained that information and is now using it, or allowing others to use it, to carry out the exact "vindictive" campaign against RMA and its leadership that Massett previously disavowed.

10.     The recent emails use a variety of pseudonyms, including "John Nemo" and "Jane Nemo," tied to a supposed organization called "Concerned Friends of R-MA," to conceal their

source.  Despite this effort to obscure the actual sender of the communications, RMA has developed evidence supporting a well-founded belief that Massett has used, or allowed others to use, confidential and trade secret information he obtained while at RMA in generating both the substance and recipients of the emails.

11.    The pseudonymous emails include information about RMA's internal operations and strategic decisions that can be traced directly to Massett, including specific details about conversations Massett had with RMA's president, Brigadier General David C. Wesley, USAF, Retired, while Massett was employed by RMA.  The pseudonymous emails also echo the same "grievances" that Massett previously threatened he could transmit to "RMA constituents" using the confidential and trade secret information he misappropriated from RMA.

12.    Information available to RMA regarding the recipients of the pseudonymous emails provides further evidence that Massett has used or allowed others to use RMA's confidential and trade secret information in connection with those emails.  In particular, evidence identified by RMA reflects that the pseudonymous emails went to email accounts included in the contact information Massett admittedly took but *not* to email accounts added to RMA's proprietary contact lists after Massett's termination.

13.    In light of such evidence, on May 17, 2024, RMA (through outside counsel) wrote to Massett to demand that he cease and desist from any further use or possession of RMA's confidential and trade secret material, return all of the relevant devices and other sources of RMA's property, and cooperate in mitigating the harm he had caused to RMA.  Massett has failed to comply with RMA's demand, or, indeed, to respond in any manner to RMA.  "John Nemo" and "Jane Nemo," however, have continued to send both mass and individualized emails using RMA's confidential and trade secret information.

14.     The evidence of misappropriation that RMA has identified to date appears to be the tip of the iceberg.  Discovery will be needed to determine the full extent of Massett's theft of RMA's confidential and trade secret information and the resulting harm to RMA.

15.     RMA therefore brings this Complaint to stop Massett's ongoing, intentional, and repeated breach of his contractual obligations to RMA, and to protect RMA's confidential and trade secret information, which Massett misappropriated and which, on information and belief, he is using or allowing others to use in violation of state and federal law.

## THE PARTIES

16.     Plaintiff RMA is a 501(c)(3) non-profit, private educational institutional located in Front Royal, Virginia.

17.      Defendant Massett resides in Front Royal, Virginia.

## JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1836(c) because RMA's claim under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, arises under federal law.  This Court has supplemental subject matter jurisdiction over RMA's remaining state law claims pursuant to 28 U.S.C. § 1367 because they are so related to RMA's federal DTSA claim that they form part of the same case or controversy and derive from a common nucleus of operative facts.

19.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to this action occurred in Front Royal, which is in Warren County, Virginia.  Additionally, Massett resides in Front Royal and RMA is located in Front Royal.

**FACTUAL ALLEGATIONS**

**I.    RMA Invested Significant Resources to Develop Its Confidential and Trade Secret Information**

20.    RMA is a private, 501(c)(3) non-profit boarding and day school for students in grades 6 to 12 and post-graduate students.  It was founded in 1892 and, in the 13 decades since its founding, has worked to further its mission of shaping good character through positive leadership, professional conduct, and service.  It is accredited by the Virginia Association of Independent Schools and maintains memberships in the Association of Military Colleges and Schools in the United States, The Association of Boarding Schools, and the Virginia Council for Private Education.  RMA maintains a 100% college acceptance rate for its graduates and has thousands of alumni located in Virginia, across the United States, and in foreign countries.

21.    RMA actively works to enhance access to its education for the broadest pool of qualified candidates, including those who might not be able to afford the costs of tuition and boarding at a private school without financial assistance.  It does this by devoting significant resources to cultivating charitable donations from its constituents, past and present.  Those constituents include RMA alumni; parents and grandparents of current, past, and prospective RMA students; and current and past RMA faculty and staff, as well as foundations, businesses, organizations, and others that RMA believes, based on its research and efforts, may choose to support RMA and its students financially.

22.    In connection with its efforts to identify sources of charitable donations, RMA has engaged with thousands of actual and potential donors.  RMA has devoted substantial efforts over decades to the creation, development, and maintenance of detailed information about past, current, and potential future donors to RMA, including their personal contact information, their employment and educational history, their history of charitable giving, their interests and

6

affiliations, and other non-public information relating to RMA's development pursuits (collectively, "Donor Information"). For example, RMA maintains personal contact information for, and regularly communicates with, alumni whose graduation dates span eight decades—the 1940s to the present. The Donor Information compiled by RMA is the result of thousands of hours of efforts and considerable expense.

23.     The Donor Information is a key factor in RMA's ability to meet its goal of making its education available to qualified students who might not otherwise be able to afford a private school education. For example, as reflected in RMA's most recently available public tax filings,[1] RMA provided financial aid and scholarships totaling nearly $12 million to hundreds of students during the covered tax years. As a result of the generosity of RMA's donors, these students were able to attend RMA.

## II.     RMA Protects Its Confidential and Trade Secret Information

24.     As a non-profit educational institution, charitable donations are a key contributor to RMA's ability to carry out its educational mission. Charitable contributions are also a limited resource and there are many organizations and institutions competing for donors' dollars. RMA accordingly restricts access to its Donor Information both externally and internally. RMA does not sell its Donor Information or share it with any outside organization. RMA also takes steps to ensure its Donor Information is protected from disclosure outside RMA, or from use for any purpose other than the specific purposes approved by RMA.

25.     RMA utilizes a number of safeguards to protect its confidential and trade secret information. Those safeguards include, but are not limited to:

---

[1] As a 501(c)(3) organization, RMA's tax filings are publicly available. *See* https://apps.irs.gov/app/eos/details/ (last visited May 31, 2024). The most recent returns available from the IRS website span tax years 2016 to 2022.

    a.   requiring potential employees who may encounter confidential information during the hiring process to agree to a non-disclosure agreement that requires the potential employee to keep confidential, and not to use or disclose to any third party, RMA's proprietary, confidential, and trade secret information;

    b.   requiring employees whose job responsibilities may include receiving proprietary, confidential, and trade secret information to contractually agree that, during and after their employment, they will not use or disclose RMA's proprietary, confidential, and trade secret information except as authorized by RMA;

    c.   implementing written policies that prohibit RMA's personnel from disclosing any proprietary, confidential, and trade secret information learned during the course of or as a result of their Academy employment;

    d.   using badge IDs to restrict access to and within its facilities;

    e.   restricting access to its computerized information through the use of passwords and Microsoft Azure Active Directory;

    f.   restricting access to its computerized information based on each individual employee's "need to know" the particular information; and

    g.   implementing physical and electronic security measures, such as employing locks on physical offices and facilities, as well as using passwords, segregating confidential information, and employing security time-outs on electronic devices.

26.    Each of these safeguards applies to RMA's Donor Information.  RMA's Donor Information is subject to additional security measures as well: In addition to each of the above protections, RMA's Donor Information is secured through the use of strong encryption mechanisms, including Transport Layer Security and encryption algorithms that meet Federal Information Processing Standards.

## III.  Massett Repeatedly Promised To Protect RMA's Confidential and Trade Secret Information

27.    Because of the confidential and trade secret nature of RMA's Donor Information, as an express condition of interviewing for a position in RMA's Advancement Office, Massett was required to sign a Non-Disclosure Agreement ("NDA") acknowledging the confidential and trade

secret nature of the information used by RMA in connection with its development activities.  The

NDA executed by Massett acknowledged that:

> R-MA's trade secrets consist of information and materials that are valuable and not
> generally known by [the] school's competitors, including:
>
> (a)  Financial standing and budget information, marketing
>       strategies, operating philosophies and strategies and human
>       resource management policies.
>
> (b)  Any and all information concerning R-MA's current, future or
>       proposed plans, including, but not limited to, computer code,
>       drawings, specifications, notebook entries, technical notes and
>       graphs, computer printouts, technical memoranda and
>       correspondence, long-term plans and related strategies and
>       techniques.
>
> (c)  Information and materials relating to R-MA's purchasing,
>       accounting and marketing; including, but not limited to,
>       marketing plans, parent lists, alumni/ae lists, development
>       lists, unpublished promotional material and costs and pricing
>       information.
>
> (d)  Information of the type described above which R-MA
>       obtained from another party and which the institution treats as
>       confidential, whether or not owned or developed by R-MA.
>
> (e)  Discussions of a confidential nature with faculty, staff,
>       administration and Board of Trustee members.
>
> (f)  Internal communications with employees that are proprietary
>       and confidential in nature due to the sensitivity of such
>       information.

*See* Ex. 1, ¶ 3.

28.    The NDA executed by Massett provided that "[a]t all times, Louis Massett agrees

to keep confidential and will not make use of or disclose to any third party information obtained

from R-MA."  *See* Ex. 1, ¶ 4.

29.    In June 2021, prior to beginning his employment with RMA and as an express

condition of that employment, Massett executed an employment agreement ("2021 Agreement")

that reiterated his obligation to protect RMA's confidential and trade secret information, including

its Donor Information, both during and after his employment:

> You acknowledge that during the course of your employment with the Academy, you may obtain and/or have access to confidential, sensitive or proprietary information related to the Academy and its students. Such confidential information includes, but is not limited to, matters relating to students, parents, employees, donors, and benefactors, including but not limited to, academic records; addresses; financial information; and other confidential and personal information. This information shall also include information protected from disclosure by the Health Insurance Portability and Accountability Act ("HIPAA") and information regarding academic programs, plans and materials deemed by the Academy to be proprietary in nature. ***You agree that during your employment with the Academy and thereafter, for so long as the pertinent information remains confidential, you will not divulge or make use of any confidential information, directly or indirectly, personally, or on behalf of any other person, business, corporation, organization, or entity, without the President's prior, written consent or the written consent of one of his authorized designees***.

*See* Exhibit 2 at 1 (emphasis added).

30.    In March 2022, Massett executed an updated employment agreement ("2022 Agreement").   Although other terms changed from the 2021 Agreement, the confidentiality obligations did not.   Instead, using the same language as his 2021 Agreement, Massett again acknowledged the proprietary, confidential, and trade secret nature of the information to which he had access as the Director of Advancement and contractually promised to safeguard and protect such information, including after his employment ended, as follows:

> You acknowledge that during the course of your employment with the Academy, you may obtain and/or have access to confidential, sensitive or proprietary information related to the Academy and its students. Such confidential information includes, but is not limited to, matters relating to students, parents, employees, donors, and benefactors, including but not limited to, academic records; addresses; financial information; and other confidential and personal information. This information shall also include information protected from disclosure by the Health Insurance Portability and Accountability Act ("HIPAA") and information regarding academic programs, plans and materials deemed by the Academy to be proprietary in nature. ***You agree that during your employment with the Academy and thereafter, for so long as the pertinent information remains confidential, you will not divulge or make use of any confidential information, directly or indirectly, personally, or on behalf of any other person, business, corporation, organization, or entity, without the President's prior, written consent or the written consent of one of his authorized designees***.

*See* Exhibit 3 at 1 (emphasis added).

31.     Both the 2021 Agreement and the 2022 Agreement required Massett "to comply with all rules established by the Academy, including, but not limited to, written standard operating procedures, the Employee Policy Manual, as well as other written directives which are appropriate to your professional and ancillary duties, as adopted and/or revised from time to time." *See* Ex. 2 at 1; Ex. 3 at 1.

32.     Throughout Massett's employment, RMA's Employee Policy Manual required employees to protect RMA's proprietary, confidential, and trade secret information and prohibited any disclosure of such information except upon authorization by RMA's president:

> Proprietary information which is available to employees by reason of their employment must be held in the strictest of confidence.  This includes any information about individual students (ie Magnus information, social security numbers, etc) as well as information about the Academy. The authority to release information is granted by the President of the Academy.

*See, e.g.*, Ex. 4 at 29.

## IV.    Massett's RMA Tenure and Termination

33.     To perform his duties as RMA's Director of Advancement, Massett was given access to a wide range of RMA's highly confidential, proprietary information.  The information to which Massett received access included, but was not limited to, RMA's Donor Information.

34.     Massett was one of only a handful of employees with access to RMA's Donor Information.  Massett received this access solely because his RMA duties included using that information to communicate with actual and potential donors himself, as well as overseeing the efforts of other employees in the Advancement Office who were tasked with communicating with actual and potential donors.

35.     In October 2022, Massett sent emails to RMA's President, as well as to its Board of Trustees, attacking RMA and its leadership.  In an October 3, 2022 email to RMA's President, Massett accused RMA of "promoting and endorsing LGBT ideology" and "'woke' ideology" and

accused RMA's President personally of, "at best, subtly and furtively working to make R-MA a progressive school."  Massett warned that "many R-MA constituents" would "not be donating were they to know this."

36.    Massett reiterated these attacks in an email titled "RMA's Policy Regarding Woke Ideology" that he sent to RMA's Board in the early hours of Friday, October 14, 2022.  In his email, Massett pointed to the existence of a "Genders and Sexualities Club" at RMA, and the fact that one teacher "puts pronouns next to his email signature," as support for his claims.  In that same email, Massett asserted that he had "possibly misled parents and benefactors" by not disclosing RMA's supposed promotion of "'Woke' ideology."

37.    Massett copied one of RMA's major donors on his October 14, 2022 email.  RMA terminated Massett's employment hours later.

38.    Later that same day, consistent with its ordinary practice for terminated employees, RMA disabled Massett's access to information available through RMA's network, including Massett's access to RMA's Donor Information.

39.    The following Tuesday, October 18, 2022, Massett complained to the Chair of RMA's Board, Harry Austin, Jr., about being "locked out" of RMA's systems.  Massett shared his suspicion that he "was locked out from my laptop and phone for fear that after notifying me you no longer wanted to retain my services, I might contact RMA constituents and share my grievances."  Massett made clear that he could still do so, admitting, "I already have everyone's contact info on my home computer."  Massett represented, however, that he had "no intention of addressing this conflict in such a manner," asserting that doing so would be a "vindictive act" that "would only serve to undermine my efforts to remediate the injustices I've suffered."

40.     At no time prior to his termination did Massett inform RMA's leadership that he intended to download, or had downloaded, RMA's Donor Information to his home computer. RMA had provided Massett with an RMA-issued laptop to use in the performance of his job duties.

41.     Upon learning from Massett that he had downloaded RMA's Donor Information to a personal computer, Austin promptly instructed Massett "to delete that information in its entirety" from his "personal computer and any other personal devices you have or own," and further instructed Massett "to abide by the Non-Disclosure Agreement you signed when you interviewed for your position and the Confidentiality provision found in your employment agreement."  Massett confirmed receipt of Austin's communication.

## V.    RMA Traces Pseudonymous Communications Using RMA's Confidential and Trade Secret Information to Massett

42.     On April 26, 2024, a mass email titled "R-MA Survey" was sent to individuals in the RMA community, including alumni, donors, current and former trustees, current and former employees, and parents of current and former students.  The email was sent via Constant Contact,[2] from a sender using the pseudonym "Concerned Friends of R-MA" ("CFRMA").  *See* Ex. 5.

43.     The April 26 email from CFRMA solicited responses to what it described as a "comprehensive survey" that would serve as a "first step in seeking to addressing [*sic*] the loss of the AFJROTC, the reports of declining in Academic standards, promotion of progressive ideology in the school culture, as well as the accusations of discrimination and a toxic work

---

[2] Constant Contact is a digital marketing platform that, among other services, allows customers to send mass emails using contact lists in the customer's possession.  *See* https://www.constantcontact.com/about (last visited May 31, 2024).

environment." *Id.* A hyperlink to a survey created using SurveyMonkey[3] was included in the text of the email. *Id.* The next day, CFRMA sent another email, again using Constant Contact and including a hyperlink to a SurveyMonkey survey. *See* Ex. 6.

44.    Within hours of CFRMA's mass emails, RMA received inquiries from concerned recipients, questioning whether CFRMA's communications were connected to RMA and, if not, how CFRMA obtained access to the recipients' personal contact information. Many recipients expressed fear that RMA had been hacked because the contact information used by CFRMA was not publicly available but had been shared with RMA.

45.    On information and belief, some recipients of CFRMA's mass emails complained to Constant Contact that the emails violated Constant Contact's terms of use. For example, discussions on the Facebook page for "RMA Friends" (which has expressly denied any connection with CFRMA) reflect that recipients of CFRMA's email did not provide affirmative consent to the receipt of CFRMA's emails, as required by Constant Contact's Acceptable Use Policy. Those discussions indicate some recipients had submitted or intended to submit complaints to Constant Contact regarding this violation of its terms of use.

46.    On information and belief, Constant Contact prohibited CFRMA from further use of its platform as a result of such complaints, as subsequent communications from CFRMA have not been sent through Constant Contact but rather from email addresses hosted by Google, including concernedfriendsofrma@gmail.com and various email accounts associated with the domain name concernedfriendsofrma.com, including johnnemo@concernedfriendsofrma.com, janenemo@concernedfriendsofrma.com, and sumnemo@concernedfriendsofrma.com.

---

[3] SurveyMonkey is an online platform that allows users to create surveys and then collect and analyze responses. *See* https://www.surveymonkey.com/about/ (last visited May 31, 2024).

47.     Since April 26, 2024, pseudonymous senders associated with CFRMA have sent and continue to send emails, including both mass and individualized communications, to individuals in the RMA community.  On information and belief, Massett has used, or allowed others to use, Donor Information that Massett misappropriated from RMA to send these communications.  The substance and recipients of these communications provide a well-founded basis for RMA's belief regarding Massett's involvement in CFRMA and its communications.

**A.     CFRMA's Constant Contact Account Reflects a Connection with Massett**

48.     The emails sent by CFRMA using Constant Contact include a physical address for CFRMA: "6 Brodhead Lane, New York, NY 22630 US."  *See, e.g.*, Ex. 5.

49.     There is no "6 Brodhead Lane" in New York City, or anywhere else in New York.  Nor is there a "6 Brodhead Lane" within the area covered by the 22630 zip code, which includes Front Royal, Virginia, and surrounding communities.

50.     There is, however, a 6 Brodhead Drive in Cicero, New York.  That property is owned by Guy Hart, Jr.  Hart has publicly described himself as Massett's "best friend" and provided a glowing recommendation for Massett that Massett included in his application to be the Director of Advancement at RMA.

51.     Hart is not an alumnus of RMA, a current or former employee of RMA, a parent of a current or former RMA student, or a donor to RMA.  His sole connection to RMA is through Massett, who, while employed by RMA, proposed that RMA retain Hart to design and build faculty housing on the RMA campus.  RMA elected not to retain Hart.

52.     On information and belief, Massett used Hart's address to obscure Massett's connection to CFRMA—and its illegal use of RMA's Donor Information.[4]

**B.     The Substance of CFRMA's Communications Reflects a Connection with Massett**

53.     The communications sent by CFRMA's various pseudonymous email accounts contain assertions that echo those made by Massett using his own name.

54.     For example, the April 27, 2024 mass email from CFRMA makes allegations about the "duplicitousness" of "R-MA's administration" with regard to "DEI ideology" in order to "avoid turning off conservative parents and benefactors," contending RMA's alleged failure to be clear about its position is "unethical and needs to be addressed."  *See* Ex. 6.  Both the tone and substance of CFRMA's April 27 email mirror that of the October 14, 2022 email that Massett sent to RMA's Board of Trustees and a major donor to RMA, as described above.

55.     Notably, on April 27, 2024, CFRMA had an email exchange with the same donor who Massett copied on his October 14, 2022 email to RMA's Board.  Using the concernedfriendsofrma@gmail.com email account, CFRMA complained to that donor about the "Gender and Sexualities" club at RMA, just as Massett did in his October 14, 2022 email.  Also echoing Massett's October 14, 2022 email, the April 27 email sent by CFRMA complained about the use of preferred pronouns at RMA, asserting that students are RMA were being "subjected to the 'woke' garbage infecting R-MA where youth are led to believe they are to refer to people by their own designated 'pronouns.'"

56.     In that same April 27, 2024 email exchange with RMA's donor, CFRMA alleged there was a "perverse gender ideology—which is part of the Diversity, Equity, and Inclusion

---

[4] RMA does not know whether Hart is knowingly involved in CFRMA or whether Massett appropriated Hart's personal information without Hart's knowledge.

Wesley has furtively allowed at R-MA."  This, too, echoes accusations leveled by Massett—in an email sent only to Wesley—on October 3, 2022.  In that email, Massett asserted that, "for all intents and purposes, our marketing language about inclusion, diversity, and equity point [*sic*] to 'woke' ideology" which, according to Massett, "gives the impression" that Wesley is, "at best, subtly and furtively working to make R-MA a progressive school."

57.     Similarly, an email CFRMA (using the janenemo@concernedfriendsofrma.com email account) sent directly to the parent of an RMA student used materially identical language to Massett's language in an email sent while he was employed by RMA.  In a May 19, 2024 email, "Jane Nemo" claimed that RMA's President "Wesley himself said, 'R-MA is not a Christian school. It is a non-denominational school.'"  That language is indistinguishable from language used in a September 14, 2022 email that Massett sent to Wesley, in which Massett asserted, "You said to me 'R-MA is not a Christian school ... it is non-denominational.'"

58.     Further evidence that Massett is involved in CFRMA's communications is found in an email exchange excerpted on the "RMA Friends" Facebook page.  In that exchange, CFRMA described a decision Wesley made regarding the number of scholarships RMA would make available to students from Ukraine.  The details related by CFRMA in this email exchange match the details of an April 2022 conversation that Massett personally had with Wesley.

### C.     The Recipients of CFRMA's Communications Reflect a Connection with Massett

59.     RMA reviewed information about the emails sent by CFRMA that were received through RMA's email system (*i.e.*, emails CFRMA sent to recipients with an "rma.edu" email address).  RMA's review confirmed that each such recipient's email address was included in the Donor Information that Massett had access to while employed RMA—the same "contact info" Massett admitted copying to his "home computer."

60.     Tellingly, in one instance, the recipient's "rma.edu" email address changed after Massett lost access to RMA's Donor Information.  CFRMA's communications were sent to the recipient's **old** email address—the one included in the Donor Information admittedly taken by Massett—rather than the recipient's **current** email address.

61.     Similarly, employees who were hired by RMA **after** Massett misappropriated RMA's Donor Information did **not** receive CFRMA's communications at their "rma.edu" email address—but RMA employees whose contact information was in the Donor Information misappropriated by Massett did.

62.     RMA also reviewed information provided by recipients of CFRMA's emails who contacted RMA with concerns about those communications, including concerns regarding how CFRMA obtained the recipients' personal contact information.  RMA compared 30 email addresses of recipients who contacted RMA after receiving emails from CFRMA; for each of those 30 emails, the email address used by CFRMA was included in the Donor Information that Massett had access to during his RMA employment.

## VI.    Massett Refused To Respond to RMA's Demand for the Return of Its Stolen Property

63.     In light of the evidence reflecting Massett's involvement in the CFRMA communications, on May 17, 2024, RMA (through outside counsel) wrote to Massett to demand that he cease and desist from any further use or possession of RMA's confidential and trade secret information, return all of the relevant devices and other sources of RMA's property, and cooperate in mitigating the harm he had caused to RMA.  *See* Ex. 7.[5]

---

[5] The attachments to the May 17 letter (identified in that letter as Exhibits A and B) are attached to this Complaint as, respectively, Exhibits 2 and 3.

64.    RMA instructed Massett to respond no later than May 22, 2024, so the parties could work to resolve the matter without the need for litigation.  *Id.* at 4.  Massett did not respond by May 22, 2024.  RMA informed Massett that, unless the matter was resolved within 14 days, RMA would proceed with litigation.  *Id.* at 3.  Massett did not respond within the allotted 14 days.

65.    As of the filing of this Complaint, RMA has received no response from Massett: not an assurance that he complied with RMA's instruction to delete RMA's confidential, proprietary and trade secret information from his home computer; not a denial of any connection to CFRMA; and not an agreement to cease his improper and illegal conduct.  Instead, Massett has simply refused to provide any response to RMA's concerns.

**VII.    Massett's Misappropriation Has Harmed and Continues to Harm RMA**

66.    Massett's misappropriation of RMA's confidential and trade secret information, including his use, directly or through a third party, of RMA's Donor Information to send communications through various pseudonymous email accounts, has harmed RMA, including its efforts to obtain charitable donations as well as its goodwill more broadly.

67.    Recipients of CFRMA's communications have raised concerns about the security of their personal information on RMA's system.  At least one recipient has expressed hesitation about donating to RMA as a result of security concerns caused by CFRMA's use of personal information that was provided to RMA.

68.    Other recipients have raised concerns about the allegations made in the communications CRFRMA has sent using RMA's Donor Information.  While Massett is free to share his opinions regarding RMA with others (so long as he does not violate Virginia's common-law or statutory prohibitions on defamation), he is not free to use RMA's confidential and trade secret information, including the Donor Information he misappropriated in violation of

state and federal law, to communicate those opinions.  Massett's use of RMA's confidential and

trade secret information to pursue his vindictive campaign against the school and its leadership

has damaged RMA's goodwill among the critical constituencies whose information is included

in the Donor Information that Massett misappropriated.

69.    In addition to the harm already caused by Massett's misconduct, RMA will

continue to suffer harm in the future if Massett continues to misuse RMA's trade secrets and

other confidential information.  Because of the unique nature of charitable giving, which (unlike

actual or prospective business relationships) is voluntary rather than dictated by contract, RMA

lacks an adequate remedy at law to address the harm it has already suffered.  RMA likewise

lacks an adequate remedy at law to address Massett's ongoing and future misconduct.

**COUNT I**
**MISAPPROPRIATION UNDER THE DEFEND TRADE SECRETS ACT ("DTSA")**
18 U.S.C. § 1836

70.    RMA incorporates by reference the factual allegations in each of the preceding

paragraphs as if fully set forth herein.

71.    RMA's confidential and proprietary information includes, among other things, the

information used in RMA's development activities, including the personal contact information

for RMA alumni; parents and grandparents of current, past, and prospective RMA students; and

current and past RMA faculty and staff, as well as foundations, businesses, organizations, and

others that RMA believes, based on its research and efforts, may choose to support RMA, and

other information collected by RMA regarding past, current, and potential future donors to

RMA, including their employment and educational history, their history of charitable giving,

their interests and affiliations, and other non-public information relating to RMA's development

pursuits.  This information constitutes trade secrets as defined in the Defend Trade Secrets Act of

2016, 18 U.S.C. § 1839(3) ("DTSA").

72.    Such information derives independent economic value from not being generally known to other unauthorized persons.  RMA has taken reasonable measures to preserve the confidentiality of the above-described trade secrets, including through the use of handbooks, policies, physical security measures, and electronic security measures such as password protections, data encryption, and restricted network access.  RMA also requires actual and potential employees who may be exposed to such information to contractually agree to protect such information from unauthorized use or disclosure.

73.    RMA's trade secrets are used in interstate commerce as part of RMA's development activities, which include communications with actual and potential donors located throughout the United States.

74.    Massett obtained access to RMA's trade secrets while under contractual and fiduciary duties to keep them secret and not disclose them.

75.    Massett knew or should have known that RMA's trade secrets (a) are confidential; (b) were acquired from RMA under circumstances giving rise to Massett's duty to maintain the secrecy of the trade secret or limit the use of the trade secret; (c) were developed or acquired by RMA at great expense and effort; (d) are maintained as confidential and are not generally available to the public or others outside RMA; (e) would provide significant benefit to a competitor, such as other non-profit or educational institutions that likewise rely on charitable giving for some or all of their funding; and (f) are critical to RMA's ability to carry out its educational mission.

76.    Massett admittedly retained RMA's trade secrets after his authorization to access them ended, upon his October 14, 2022 termination.

21

77.     At no time has RMA consented to Massett's acquisition, disclosure, or use of RMA's trade secrets for any reason unrelated to Massett's RMA employment.

78.     Massett's misappropriation of RMA's trade secrets was made in bad faith, and it was willful and malicious.  Massett was aware of the agreements he signed with RMA and that RMA treats its Donor Information as trade secrets.  Massett was expressly informed that he was not permitted to retain RMA's information after the end of his employment with RMA and was instead instructed to destroy the information he admitted misappropriating.

79.     Massett did not destroy the misappropriated trade secrets as instructed.  Nor did he adhere to the express contractual restrictions prohibiting his use or disclosure of those trade secrets, despite being reminded of his contractual obligations following his termination.

80.     RMA has been, and without injunctive relief will continue to be, irreparably harmed by Massett's misappropriation of RMA's trade secrets.

81.     Pursuant to 18 U.S.C. § 1836(b)(3)(A), RMA is entitled to injunctive relief to prevent future misappropriation and use of its trade secrets, including, but not limited to, an order requiring Massett to return to RMA any and all confidential documents and information that he received, obtained, took, or transferred from RMA (electronically or otherwise).

82.     Pursuant to 18 U.S.C. § 1836(b)(3)(B)(i), RMA is entitled to damages for actual losses caused by the misappropriation of its trade secrets.

83.     Pursuant to 18 U.S.C. §§ 1836(b)(3)(C)–(D), RMA is entitled to recover its attorneys' fees and exemplary damages totaling twice the award made under § 1836(b)(3)(B) for Massett's willful and malicious misappropriation.

## COUNT II
## MISAPPROPRIATION UNDER THE VIRGINIA UNIFORM TRADE SECRETS ACT
Va. Code § 59.1-336

84.     RMA incorporates by reference the factual allegations in each of the preceding paragraphs as if fully set forth herein.

85.     RMA's confidential and proprietary information includes, among other things, the information used in RMA's development activities, including the personal contact information for RMA alumni; parents and grandparents of current, past, and prospective RMA students; and current and past RMA faculty and staff, as well as foundations, businesses, organizations, and others that RMA believes, based on its research and efforts, may choose to support RMA, and other information collected by RMA regarding past, current, and potential future donors to RMA, including their employment and educational history, their history of charitable giving, their interests and affiliations, and other non-public information relating to RMA's development pursuits.  This information constitutes trade secrets as defined in the Virginia Uniform Trade Secrets Act, § 59.1-336.

86.     Such information derives independent economic value from not being generally known to other unauthorized persons.  RMA has taken reasonable measures to preserve the confidentiality of the above-described trade secrets, including through the use of handbooks, policies, physical security measures, and electronic security measures such as password protections, data encryption, and restricted network access.  RMA also requires actual and potential employees who may be exposed to such information to contractually agree to protect such information from unauthorized use or disclosure.

87.     Massett obtained access to RMA's trade secrets while under contractual and fiduciary duties to keep them secret and not disclose them.

88.     Massett knew or should have known that RMA's trade secrets (a) are confidential; (b) were acquired from RMA under circumstances giving rise to Massett's duty to maintain the secrecy of the trade secret or limit the use of the trade secret; (c) were developed or acquired by RMA at great expense and effort; (d) are maintained as confidential and are not generally available to the public or others outside RMA; (e) would provide significant benefit to a competitor, such as other non-profit or educational institutions that likewise rely on charitable giving for some or all of their funding; and (f) are critical to RMA's ability to carry out its educational mission.

89.     Massett admittedly retained RMA's trade secrets after his authorization to access them ended, upon his October 14, 2022 termination.

90.     At no time has RMA consented to Massett's acquisition, disclosure, or use of RMA's trade secrets for any reason unrelated to Massett's RMA employment.

91.     Massett's misappropriation of RMA's trade secrets was made in bad faith, and it was willful and malicious.  Massett was aware of the agreements he signed with RMA and that RMA treats its Donor Information as trade secrets.  Massett was expressly informed that he was not permitted to retain RMA's information after the end of his employment with RMA and was instead instructed to destroy the information he admitted misappropriating.

92.     Massett did not destroy the misappropriated trade secrets as instructed.  Nor did he adhere to the express contractual restrictions prohibiting his use or disclosure of those trade secrets, despite being reminded of his contractual obligations following his termination.

93.     RMA has been, and without injunctive relief will continue to be, irreparably harmed by Massett's misappropriation of RMA's trade secrets.

94.     Pursuant to Va. Code § 59.1-337, RMA is entitled to injunctive relief to prevent future misappropriation and use of its trade secrets, including, but not limited to, an order requiring

Massett to return to RMA any and all confidential documents and information that he received, obtained, took, or transferred from RMA (electronically or otherwise).

95.    Pursuant to Va. Code § 59.1-338(A), RMA is entitled to damages for actual losses caused by the misappropriation of its trade secrets.

96.    Pursuant to Va. Code §§ 59.1-338(B) & 59.1-338.1(i), RMA is entitled to recover exemplary damages totaling the lesser of twice the damages awarded or $350,000 and RMA's reasonable attorneys' fees for Massett's willful and malicious misappropriation.

**COUNT III**
**CONVERSION**

97.    RMA incorporates by reference the factual allegations in each of the preceding paragraphs as if fully set forth herein.

98.    RMA pleads this claim for conversion to the extent any of the documents or information that Massett stole from RMA do not rise to the level of a trade secret under applicable law.

99.    RMA is the owner of the confidential information, including the Donor Information, described in the preceding paragraphs.

100.    Massett has no legal right to RMA's confidential information.

101.    Massett kept RMA's confidential information after the termination of his employment with RMA without seeking or obtaining RMA's consent and in violation of his contractual and fiduciary duties to RMA.

102.    At no time has RMA consented to Massett possessing RMA's confidential information after the termination of his employment with RMA.

103.    At no time has RMA consented to Massett's acquisition, disclosure, or use of RMA's confidential information for any reason unrelated to Massett's RMA employment.

104.    As a result, Massett is wrongfully exercising dominion or control over RMA's confidential information in a manner that is inconsistent with RMA's right to that information.

105.    RMA is entitled to the immediate return of its confidential information.

106.    Although RMA is entitled to damages to compensate it for the harm it has suffered, for the reasons set forth above, these damages will not provide an adequate remedy at law for Massett's conversion of RMA's confidential information.  RMA is threatened with additional and ongoing injuries, including further damages and loss of goodwill unless Massett is enjoined and restrained by an order of this Court.  RMA is entitled to an order requiring Massett to return any RMA confidential information, enjoining any further use or disclosure of that information, and enjoining Massett from wrongfully possessing RMA's confidential information.

**COUNT IV**
**BREACH OF CONTRACT**

107.    RMA incorporates by reference the factual allegations in each of the preceding paragraphs as if fully set forth herein.

108.    On March 23, 2022, Massett executed an agreement binding him to certain obligations regarding RMA's proprietary, confidential, and trade secret information.  Ex. 3.  The 2022 Agreement is a valid and enforceable contract between RMA and Massett.

109.    In executing the 2022 Agreement, Massett acknowledged that he "may obtain and/or have access to confidential, sensitive or proprietary information related to the Academy and its students" during the course of his employment with RMA.  *Id.* at 1.

110.    Massett agreed, among other things, that "during [his] employment" with RMA, and "thereafter, for so long as the pertinent information remains confidential," he would not

> divulge or make use of any confidential information, directly or indirectly, personally, or on behalf of any other person, business, corporation, organization, or entity, without the President's prior, written consent or the written consent of one of his authorized designees.

*See* Exhibit 3 at 1.

111.    Per the 2022 Agreement, RMA's confidential, sensitive, or proprietary information "includes, but is not limited to, matters relating to students, parents, employees, donors, and benefactors, including but not limited to, academic records; addresses; financial information; and other confidential and personal information. This information shall also include information protected from disclosure by the Health Insurance Portability and Accountability Act ("HIPAA") and information regarding academic programs, plans and materials deemed by the Academy to be proprietary in nature." *Id.*

112.    Massett breached his confidentiality obligations in the 2022 Agreement, and he continues to breach those obligations by, among other things, continuing to possess and, on information and belief, misuse RMA's confidential, proprietary, and trade secret information.

113.    As a direct and proximate result of Massett's breaches, RMA has suffered, and continues to suffer, damages, including harm to its goodwill.

114.    RMA is threatened with additional and ongoing injuries, including loss of charitable donations and goodwill, unless Massett is enjoined and restrained by an order of this Court.

## **PRAYER FOR RELIEF**

**WHEREFORE**, RMA respectfully requests that this Court grant the following relief:

(1)    enter judgment in favor of RMA on all counts of this Complaint;

(2)    preliminarily and permanently enjoin Massett from using or disclosing any of RMA's confidential, proprietary and/or trade secret information;

(3)    order Massett, at his sole expense, to:

      (a)     return to RMA any and all confidential or trade secret information that he received, obtained, took, or transferred from RMA (electronically or otherwise);

      (b)     provide a sworn written certification, under penalty of perjury, that identifies all individuals or entities to which Massett disclosed RMA's confidential or trade secret information;

      (c)     provide a sworn written certification, under penalty of perjury, that states that Massett has returned all copies and versions of any documents containing RMA's confidential or trade secret information in his possession, custody, or control; and

      (d)     make available to RMA for inspection any electronic devices, including personal computers, laptops, desktops, iPads or similar tablet devices, smartphones, and other hand-held devices, as well as any cloud-based or social media-based accounts, that are, or have been, in the possession, custody, or control of Massett for RMA to forensically review the devices or accounts and identify all RMA information or files that will then be promptly returned to RMA and removed from the devices and/or accounts.

    (4)     for a period of two years, or such other period of time as the Court deems appropriate, put in place a monitor (funded by Massett) to ensure that Massett is no longer in possession of, using, or disclosing RMA's confidential or trade secret information or materials, and to provide regular reports of the Monitor's work to the Court and RMA;

(5)    award RMA money damages, including compensatory damages, exemplary damage, and punitive damages pursuant to 18 U.S.C. § 1836(b)(3)(B)–(C), Va. Code § 59.1-338, or as otherwise permitted by law, in an amount to be proven at trial;

(6)    award RMA its costs, expenses, and reasonable attorneys' fees incurred in this action, as provided for under 18 U.S.C. § 1836(b)(3)(D), Va. Code § 59.1-338.1, or as otherwise provided by law;

(7)    award RMA pre-judgment interest, post-judgment interest, and costs of Court, to the extent permitted by law; and

(8)    award such other relief as this Court deems just and proper.

### JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, RMA requests a jury trial of all issues properly triable by jury.

### VERIFICATION

As President of Randolph-Macon Academy, I have read the foregoing Verified Complaint and certify that the allegations contained therein are true and accurate to the best of my knowledge and belief based on information and records available to me.

Brigadier General David C. Wesley, USAF, Retired
President, Randolph-Macon Academy

Dated:  May 31, 2024

Respectfully submitted,

*/s/ J. Benjamin Rottenborn*
Mark D. Loftis, Esq. (VSB #30285)
mark.loftis@woodsrogers.com
J. Benjamin Rottenborn (VSB No. 84796)
ben.rottenborn@woodsrogers.com
**WOODS ROGERS VANDEVENTER BLACK PLC**
10 S. Jefferson Street, Suite 1800
Post Office Box 14125
Roanoke, VA  24038-4125
Telephone: (540) 983-7600
Facsimile: (540) 983-7711

F. Whitten Peters (*pro hac vice motion forthcoming*)
wpeters@wc.com
Vidya A. Mirmira (*pro hac vice motion forthcoming*)
vmirmira@wc.com
Juli Ann Lund (*pro hac vice motion forthcoming*)
jlund@wc.com
**WILLIAMS & CONNOLLY LLP**
680 Maine Avenue SW
Washington, DC 20024
Telephone: (202) 434-5000
Facsimile: (202) 434-5029

*Attorneys for Plaintiff Randolph-Macon Academy*